Nos. 37,473 and 37,480

In the Matter of the Estate of Louise Grobbe, Deceased. ARTHUR GROBBE and MILDRED GROBBE, *Appellants* and *Cross Appellees,* v. ELSIE MISAMORE and JOHN W. BROOKENS, Administrator of the Estate of Louise Grobbe, deceased, *Appellees* and *Cross Appellants.*

(208 P. 2d 243)

Opinion filed July 9, 1949.

*Harry Snyder, Jr.,* of Topeka, argued the cause, and *A. Harry Crane* and *Ward D. Martin,* both of Topeka, were with him on the briefs for the appellants and cross appellees.

*D. C. Hill,* of Wamego, argued the cause and was on the briefs for the appellee and cross appellant, Elsie Misamore.

*John W. Brookens,* administrator, of Westmoreland, attorney *pro se.*

The opinion of the court was delivered by

HARVEY, C. J.: This action started in the probate court of Pottawatomie county by Arthur Grobbe and his wife filing a claim in the estate of his mother, Louise Grobbe, deceased, in the sum of $10,574.78 for food, clothing and care given the mother after the death of her husband, for which it was alleged she had orally agreed to pay. The claim was defended by the administrator of the estate and by Elsie Misamore, the only other heir at law of the deceased. After a hearing the court allowed the claim in the sum of $997.50. The claimants appealed to the district court, where the parties filed formal pleadings. After a hearing *de novo,* at which much evidence was received, the court found:

"That no contract existed or was ever entered into between the appellants, Arthur Grobbe and Mildred Grobbe, and Louise Grobbe, deceased, as alleged in appellants' petition; that appellants are not entitled to recover upon *quantum meruit* in any amount for services rendered as alleged in their petition; that appellants are entitled to recover the value of the food and clothing furnished by appellants to the said Louise Grobbe, deceased, during her lifetime in the sum of $999.00, less payments received of $269.08, or in a total sum of $729.92; and that the appellee, John W. Brookens, as administrator of the estate of Louise Grobbe, deceased, shall pay the costs of this action."

Judgment was rendered in harmony with these findings. Claimants' motion for a new trial was overruled and they have appealed from the judgment and from the order overruling the motion for a

new trial. The administrator and Elsie Misamore filed a motion for a new trial, which was overruled, and they have appealed from the judgment against the administrator and from the order overruling their motion for a new trial.

Some of the background of this case shown by the record may be stated as follows: Henry Grobbe and his wife, Louise, lived on a farm about eleven miles northeast of Wamego for many years. They were frugal, hard-working German people. Louise Grobbe was born in Germany. She had but little education, could not read, but could write her name. They lived much to themselves and did not visit with their neighbors nor attend social gatherings. He transacted all of the business, even to the buying of household needs. They took no newspapers until their first child, Elsie, had learned to read at school, when they subscribed to a weekly farm paper. Elsie married when she was twenty-one and she and her husband had lived on a farm nine miles northwest of Wamego for twenty-five years at the time of the trial of this action. Sometime after her marriage, not definitely shown by the record, Henry Grobbe bought a residence property in Wamego and he and his wife lived there until the time of their respective deaths. Arthur Grobbe, six or eight years younger than Elsie, grew up on the farm and was married at some date not shown, and appears to have lived on the farm and operated it, but at sometime he and his father, Henry Grobbe, became estranged and he moved from the farm. They had nothing to do with each other thereafter. On August 19, 1938, Henry Grobbe executed his will, to which his wife duly consented, by which, after providing for the payment of his debts and funeral expenses, he gave all of his property to his wife, Louise Grobbe, for her life, with power of sale of any part of it she deemed necessary to provide the means for her care and comfort, and gave the remainder to his daughter, Elsie Misamore. He gave to his "son Arthur Grobbe any and all sums he may be owing me at the time of my death, and nothing more." Henry Grobbe died June 9, 1940. Three days later Louise Grobbe filed in the probate court a petition to admit to probate her husband's will. After due notice and hearing the court on August 5, 1940, made an order admitting the will to probate and appointing C. B. Hilliard executor. He duly qualified and administered the estate. On April 9, 1941, Louise Grobbe and Arthur Grobbe filed a notice of appeal from the order admitting the will to probate. Pending that appeal and on August 22, 1941,

Louise Grobbe, as first party, Arthur Grobbe and his wife as second parties, and Elsie Misamore and her husband as third parties, each represented by able counsel, entered into a written "Stipulation of Family Settlement," which, so far as here pertinent, provided that the appeal from the order probating the will should be dismissed; that the will of Henry Grobbe should stand and remain in force as probated; that Elsie Misamore and husband should execute a deed to Arthur Grobbe of a one-fourth interest in the home place in Wamego and the farm, subject to the life estate with power of disposal in Louise Grobbe, and that at the death of Louise Grobbe there should be paid in cash on hand arising from the rents or sale of real estate and from the real estate itself, the funeral expenses and any unpaid bills of Louise Grobbe.

Louise Grobbe continued to live in the home in Wamego until her death intestate March 18, 1947, leaving her son, Arthur Grobbe, and her daughter, Elsie Misamore, as her sole heirs at law. Eleven days later Elsie Misamore filed in the probate court a petition for the appointment of an administrator of her estate. Arthur Grobbe filed and answer thereto opposing the appointment. After a hearing and on April 26, 1947, the court made appropriate findings and sustained the petition and appointed John W. Brookens as administrator of the estate. He duly qualified and is still acting. The inventory filed listed items of personal property appraised of the aggregate value of $469.10.

After the appeal from the judgment of the probate court upon the claim here in question to the district court the parties filed formal pleadings. Arthur Grobbe and Mildred Grobbe, his wife, filed a petition which alleged the estate of Louise Grobbe, deceased, was being administered in the probate court; that Elsie Misamore and Arthur Grobbe are the only heirs at law; that John W. Brookens is the duly appointed, qualified and acting administrator, and "that on or about September 1, 1941, said Louise Grobbe entered into an oral agreement with petitioners Arthur Grobbe and Mildred Grobbe whereby they were to keep themselves available at all times and perform any and all services and care required by her and that in consideration thereof the said Louise Grobbe agreed to pay the said petitioners the sum of $150 per month; that in addition thereto the said Louise Grobbe also agreed to pay said petitioners for groceries and clothing furnished by them for her"; that Louise Grobbe on numerous occasions stated that she was to pay and would

pay petitioners for their services and for food and clothing furnished; that beginning about September 1, 1941, the petitioners cared for Louise Grobbe and furnished her food, clothing and care at their own expense; that they took care of the yard and made incidental repairs about her home and were on call when needed by her, and stayed with her and cared for her whenever requested, preparing meals for her in her illness and assisted with her business matters; that Louise Grobbe spoke only German and broken English and it was difficult for her to use the telephone; that petitioners assisted her in ordering her groceries and telephoning and furnished much of it at their own expense; that she was subject to occasional periods of despondency, which made it necessary for the petitioners to be available to nurse and care for her at those times, even losing jobs in order to assist and care for her; that the services and property were furnished pursuant to the aforesaid contract and continued until her death; that petitioners are entitled to $150 a month for 66$^{19}/_{30}$ months, or the sum of $9,940, which sum is also the fair and reasonable value of such services, and that during all of that time petitioners furnished food, clothing and other necessaries to Louise Grobbe as the same were required; "however, the petitioners are unable to furnish an itemized statement of the articles of food and clothing furnished but allege that the amount expended by them for such articles and the fair and reasonable value of such necessaries was in the sum of at least $15 per month for 66$^{19}/_{30}$ months or the sum of $999, making a total of $10,989 for services and necessaries; that the said Louise Grobbe made payments periodically to these petitioners which payments were as follows, listing dates and amounts paid aggregating the sum of $414.22. Deducting the above amount there remains a balance unpaid of $10,574.78," for which sum they pray that their demands against the estate be allowed.

The administrator answered, admitting the allegations of the petition as to the parties, but denied "the allegations of the Petition concerning the alleged oral agreement as set out in the Petition. However, said Administrator has been advised and therefore believes that the said Arthur Grobbe and Mildred Grobbe, his wife, assisted at times in caring for the said Louise Grobbe from and after September 1, 1941, up until the time of her death, but that the services performed by them were such services as are ordinarily performed by a child for a parent and for which there is no pre-

sumption that such services were to be paid for by the parent; and that the sum claimed for such services, as set out in the Petition, is far in excess of the fair and reasonable value of the services so rendered, even if they had been performed by some person who was not a member of her family.

"For further answer said Administrator states that he has no means of knowing whether or not the claimants herein furnished food and clothing to the said Louise Grobbe at their own expense, or whether they performed any services in connection with the work about the home, for which they were not paid, and therefore, denies the allegations of the Petition relative thereto."

The prayer was that strict proof be made of the alleged oral agreement, and of the items of food and clothing, the costs and items alleged to have been furnished, and that the court find and adjudge the sums paid by Louise Grobbe were in full payment.

Elsie Misamore filed an answer which contained a general denial of matters not admitted; admitted the allegations of the petition as to the parties, denied the existence of the oral agreement between Louise Grobbe and the petitioners alleged in the petition, and alleged if such an agreement was made it "was an unconscionable contract and this Court, sitting in equity, should refuse to enforce the same for the following reasons, to-wit: That on the date of the alleged contract the said Louise Grobbe was completely dominated by and under the strong persuasion and influence of the petitioners; that the sum of $150 per month was grossly excessive as compensation for the services to be performed by the petitioners under the alleged agreement; that the said Louise Grobbe was inexperienced in any and all matters of business and was not fully aware of the consequences of her acts and not permitted to consult with or receive the advice of her friends before entering into the alleged agreement, and the making of any such agreement on the part of the petitioners with the said Louise Grobbe was the taking of an unconscionable advantage of her." The answer further denied that petitioners furnished to the said Louise Grobbe the items of food and clothing, and alleged that for any food and clothing furnished by them they had received compensation in full. It further alleged that during all of the time Louise Grobbe was able-bodied physically, able to perform her household duties, and that she did so and took care of herself without the assistance of the petitioners; that petitioners were absent from the premises of Louise Grobbe

for long periods of time and were employed in various gainful occupations; that if Louise Grobbe made the payments to petitioners, as alleged, such payments were in full and complete settlement for all things and services furnished to her by petitioners. The answer further set up the "Stipulation of Family Settlement" and alleged the oral agreement was in violation thereof, and that the intention of the agreement was that it should be in full and complete settlement of all the rights of the parties. It was further alleged that the services alleged to have been performed by the petitioners were such as are ordinarily performed by a child for a parent and for which there is no presumption in law or equity that such services are to be paid for by the parent, and that the sums prayed for by petitioners are in excess of any amount that would be fair and reasonable.

The petitioners replied to the answer of Elsie Misamore with a general denial, except it admitted the execution of the "Stipulation of Family Settlement" and alleged that under the terms thereof Louise Grobbe had power to mortgage or sell the real estate and thus had the resources subject to her disposal with which to meet the terms of the agreement alleged. It replied also to the answer of the administrator, which reply was a general denial.

When the case was called for trial on November 6, 1947, a trial by jury was waived and a trial was had to the court. Louise Grobbe will be referred to as Mrs. Grobbe and the wife of Arthur Grobbe as Mildred. The petitioners offered no direct evidence of the making of the oral agreement between them and Mrs. Grobbe on or about September 1, 1941, alleged in their petition. They did produce witnesses who testified to statements Mrs. Grobbe had made to them. This testimony may be summarized as follows:

Arthur Hoffset lived near Wamego and was engaged as a farmer and truck driver. He delivered wood to Mrs. Grobbe in 1939 and coal in 1942 and 1943. On October 7, 1943, he delivered coal. Arthur and Mildred were present. Mildred was working around the house. Arthur helped him put the coal in the bin. He was not employed nor paid by the witness. After the coal was in the bin he talked with Mrs. Grobbe. She said Mildred worked hard and could do almost anything and she had promised to pay them for their work. She thought $150 would be about right.

"State anything else she said. A. She said she had promised to pay them $150 a month for helping and taking care of her."

Arthur and Mildred had worked for him at different times, sometimes one and sometimes the other. Mildred helped him fix fence and at one time helped him paint a truck.

John Zima lived at Emmett and was engaged in farming and buying hogs and cattle. One spring, two or three years before the trial, he went to Wamego to look for Arthur. He did not find him and went to Mrs. Grobbe's home and asked where Arthur was. She said she did not know where he went.

"She asked what I wanted and I said I would like to hire him to help out on the farm. She said she didn't think he would go. She said he was working and taking care of her and she did not suppose I would want to pay him as much as she was paying. I told her I would pay $125 a month and she said she was paying $150 and he would not come."

Mrs. Joe Novak lived at Council Grove. She lived next door to Mrs. Grobe from September, 1942, to June, 1943, and became acquainted with her and with Arthur and Mildred.

"Mrs. Grobbe said that Arthur and Mildred looked after her, and she did not know what she would do without them, she hoped they would get their share of the estate."

Mrs. Charles Cordts, Sr., lived in Wamego across the street from Mrs. Grobbe and visited her about once a week. She had conversations with her about Arthur and Mildred. On Decoration Day, 1946, she and her husband visited with Mrs. Grobbe, when she talked about her children.

"Q. What more did she say in regard to Mildred and Arthur? A. Said they were taking care of her and she intended to pay for it and said $150 per month."

". . . . . . . . . . . . . ."

"Q. To refresh your memory did she ever say anything to you about an agreement or promise to pay for their services? . . . A. She said it was her intention they should have $150 per month, that's what she wanted done."

John Nicklas, a cousin of Arthur's and the son of Bertha Nicklas and her husband spoke of an occasion when he was at Mrs. Grobbe's about a year and a half after her husband's death.

"Q. Do you remember a statement Mrs. Grobbe made on that occasion in regard to Arthur and Mildred? . . . A. She said she had made an agreement with them they were to take care of her the rest of her life and that they agreed to do it and she had agreed to pay them $150 a month and I believe it was witnessed by Dr. Bruner."

Elmo Polensky, Mildred's sister, was acquainted with the family. She remembers an occasion on a Sunday evening in the fall of 1941

or 1942. Mildred was washing and Arthur was fixing a clock in the kitchen. In referring to Mildred and Arthur Mrs. Grobbe said:

"If she needed help they offered to take care of her. She said she paid them part but could not give them all of it; that she promised they could have $150 a month for taking care of her, felt they should have that much but she could not give it to them now."

Lillian Phillis, Mildred's sister, lived with Mildred and Arthur part of the time in 1943, 1944 and 1945 while her husband was away in the service. She spoke of an occasion when "Bud," the son of Arthur and Mildred, was operated on for appendicitis in Topeka and she had taken Mildred to Topeka to see him and returned to tell Mrs. Grobbe how he was.

"She was glad to know he was getting along all right. She also mentioned how good Arthur and Mildred were to her and that they were doing everything they could for her; that they had agreed to take care of her and she had promised to pay them, pay part now and the rest when she could get it and she thought $150.00 per month would be right for them."

Bertha Nicklas, Mrs. Grobbe's sister, testified by deposition. She lived at Vliets and she and her husband visited Mrs. Grobbe about once a month. She and her husband would go there before noon, have dinner and leave about two or three o'clock. She talked in German with Mrs. Grobbe about Arthur and Mildred.

"Q. Now did Mrs. Grobbe ever say anything about paying the children for their work there? A. Ja. She said she paid them some and she would pay them more."

August Nicklas, the husband of the previous witness, testified about the same as to their visits to Mrs. Grobbe.

"Q. Did she ever say anything about paying them for their work. A. Ja. She said she give them a little but she wanted to give him some more.

"Q. Did she say anything about paying Mildred, or were they both included in the same conversation? A. Probably in the same, I don't know.

"Q. Did she make those statements to you more than once? A. Oh, ja, ja.

"Q. How frequently? A. Pretty near every time I was there.

"Q. That she had paid them some and wanted to pay them more? A. Ja."

Mrs. Minnie Wrosch, Mrs. Grobbe's sister, lived near Wheaton. She visited Mrs. Grobbe after her husband's death, usually in the daytime. Mrs. Grobbe would say Arthur and his wife were pretty good to take care of her. She had seen Mildred there and also saw Arthur after Mrs. Grobbe's arm was broken. She was not asked what, if anything, Mrs. Grobbe had said about paying Arthur and Mildred.

In the items of the petition which made up the sum of $414.22, for which petitioners had been given credit, Mrs. Grobbe's check, dated December 27, 1941, to Arthur Grobbe for $80 bore the notation for "one month's salary"; also a check dated April 18, 1942, to Mildred Grobbe for $65.14, which bore the notation, "one month's salary."

In the "Stipulation of Family Settlement" of the estate of Henry Grobbe it was agreed that there should be delivered to Mrs. Grobbe the full title to a 1926 Chrysler automobile and also to household goods, utensils and implements used in the home as her sole and separate property. When the estate of Henry Grobbe was settled there was a balance to be distributed of $410.54, which was paid to Mrs. Grobbe. After the estate was settled her only income was from the rents of the farm. The executor of the estate had leased the farm to Lawrence Osborne for one year, beginning March 1, 1941 for $400 cash rent, the tenants to furnish Mrs. Grobbe with wood at a dollar a rank [rick] delivered. Then a real estate man drew a lease from Mrs. Grobbe and Arthur to Mr. Osborne for $425 per year, the tenant to furnish Mrs. Grobbe as many as twenty-five ricks of wood per year, to be credited upon the lease, at one dollar per rick. The payments were to be made $200 in December and the balance in Februray. The first two or three payments he made on that lease were made to Arthur or Mildred. Thereafter he was told to make the payments to Mrs. Grobbe, and at her request he did deposit them in the bank for her. Aside from the property and money she got from her husband's estate she had no income other than the rent from the farm.

Arthur Grobbe testified that he worked at various places all the time covered by his claim. As a workmen he was classified as a common laborer. From September, 1941, to April, 1942, he worked for Lawrence Merts on a farm near Wabaunsee. He then worked on REA and on different jobs about town until the fall of 1942, when he worked for about six weeks as a carpenter at Fort Riley. He then worked for the township the rest of the winter and at this and other work about town until October, 1943, when he went to work for Mr. Ulrich on a farm. This continued until January, 1945. He then worked on the road until July of that year, when he went to work on the Dan Casement ranch four miles north of Manhattan, where he worked until July, 1946. After that time he was working on jobs about Wamego and upon a house he was building for him-

self and which he moved into in October, 1946, but which was not then fully completed. A number of witnesses testified to seeing Arthur working about Mrs. Grobbe's place mowing the lawn, splitting the wood, and doing other work about the premises. Usually that was in the evening. When he was working away from Wamego he took his Sundays off and went to Wamego. Also he sometimes got off for a day or part of a day once or twice a month. In February, 1947, Mrs. Grobbe fell and broke her arm. She went to a doctor, who treated it and put on a splint, which she wore until her death, March 18. During a part of that time, at. least, Arthur stayed at Mrs. Grobbe's home and took care of her. A witness testified to being there when he was cooking a meal, and there was testimony that Mrs. Grobbe said she hoped to get well soon so Arthur could go back to his work.

Mildred lived on the farm with her husband when he was working for Merts and also when he was working for Ulrich, and perhaps when he was working on the Casement ranch. When Arthur was working for the township or county or on other jobs they lived in Wamego. Much of the time Mildred, while living in Wamego, worked at a grocery store or at a restaurant, or in various homes in Wamego, where her services seemed to be in demand. At some time she left her electric washing machine and her electric refrigerator at Mrs. Grobbe's because where she was living there was no electricity. It appears to have been her practice to take her own washing to Mrs. Grobbe's and to do Mrs. Grobbe's washing with hers. Sometimes she would go there of an evening and on some occasions stayed all night. Perhaps both she and Arthur did so on occasions.

There was evidence that Mrs. Grobbe was able to do her housework and that she was a neat housekeeper. She continued to grieve over the death of her husband and at times was somewhat despondent because of that fact and the fact that her daughter did. not visit her. It appears the daughter, Mrs. Misamore, did visit with her—in fact went and stayed several weeks at a time on two occasions—until 1941, when they had the trouble over their father's will. After the family settlement she and her brother Arthur were estranged. She thought Arthur was controlling the mother's activities and it appears she did not go to see her mother.

With respect to food and clothing furnished Mrs. Grobbe by the petitioners, Mr. Harold Miller testified that he was working in the grocery store in Wamego from 1941 to the time of Mrs. Grobbe's

death; that he took orders from over the telephone. She was hard to understand and sometimes there would be some confusion in the order. Arthur used to bring her to the grocery store and sometimes he would pay for her groceries and sometimes she would pay for them. Mildred sometimes brought her to the store and took the groceries for Mrs. Grobbe on her own account.

Mrs. Knecht lived in Wamego, across the alley from Mrs. Grobbe's home, and worked at Larson's which appears to have been a clothing store. Mildred or Arthur would come in the store once or twice a month with Mrs. Grobbe and they would purchase long-sleeved cotton dresses and underwear and some bedding and toweling that was for the use of Mrs. Grobbe. Mildred would pay sometimes with checks signed by Mrs. Grobbe and sometimes in cash.

Mrs. E. L. Hartloff and her husband operated a grocery store in Wamego in 1944 and 1945. A part of that time Mildred and Arthur lived on the Ulrich farm and part of the time at the home of the mother of the witness. Mildred did delivering and helped in the store about four days a week. Mildred had an account at the store. She delivered some groceries to Mrs. Grobbe that were charged to her account. A few times Mildred brought in a check from Mrs. Grobbe which was applied on her account. She did not remember the number or the amount of those checks. Other witnesses saw Mildred take groceries to Mrs. Grobbe's home.

Harry Stone testified he lived in Wamego and was in the restaurant business; that Mildred worked for him as a waitress in the summers of 1941, 1942 and 1943. Mrs. Grobbe would call on the telephone and ask for Mildred and sometimes she would quit work and go to Mrs. Grobbe. This interfered with the work at the restaurant and on at least one occasion he fired her because he could not depend on her, but later he had her come back. Her hours of work were from six in the morning until two p. m. and then from five until eight in the evening. On one occasion he took her with his wife to Kansas City, where she bought wearing apparel of the kind suitable for Mrs. Grobbe. Mildred went with Mrs. Stone to Manhattan, where they bought canned goods at wholesale. Mildred bought two cases at a time, five or six times, that would cost from $3.50 to $4.50 a case, which she took home to her mother-in-law.

Mrs. Edgar Miller lived in Wamego and she and her husband and son operated a grocery. She knew Mrs. Grobbe; talked with her

over the telephone. She spoke broken English and when ordering she would get mixed in what she wanted. Mrs. Miller knew Arthur and Mildred and had seen them at the store with Mrs. Grobbe. They usually brought her down. They would come down at the end of the month and she would pay her bill. Arthur and Mildred also got things for her. Mrs. Grobbe paid for her groceries.

Lillian Phillis testified she knew of her own knowledge that Mildred bought clothing for Mrs. Grobbe; mentioned one time when she was with them in Topeka, where she bought some things at Montgomery Ward's—a jacket and some long-sleeved dresses which she knew were taken to Mrs. Grobbe.

Mr. Osborne testified to having leased the farm and to payments made thereon and said he delivered an average of about fifteen ricks of wood a year to Mrs. Grobbe. He did not have occasion to go to see Mrs. Grobbe more than once or twice a year. About September, 1946, he received a call from Mrs. Grobbe over the telephone and she said she wanted to see him. He went to her place the same day.

"She wanted to know what I thought about selling the place . . . and I told her I thought it advisable for her to keep the place. . . .

"Q. In that conversation did she mention Arthur and Mildred? A. She said they wanted her to sell the place."

She made some statements that caused the witness to think she seemed to be provoked with them, although she did not use that word. He talked it over with her and told her she had to get along with someone. He advised Mrs. Grobbe not to sell the farm if she had sufficient to live on. In the course of the conversation she told him that she didn't have any money, and though the rent was not due he went to the bank and made a deposit for rent. About a week later Mildred called him and said Mrs. Grobbe wanted some wood and he took a load to her. In the course of the conversation "she said they had washed at her place a year or something like that. She wanted to know if I didn't think Arthur should split the wood. I told her that was out of my line. She continued and I said if you can afford to pay Arthur that is all right.

"Q. Did she say anything about paying him? A. Said she had paid him on the wood. . . .

"Q. Did Mrs. Grobbe ever tell you she owed anyone? A. No.

"Q. Did she tell you about paying anyone? A. Told me she had paid Arthur for splitting this wood.

"Q. Do you know who cut the grass around the house? A. She told me Arthur did. . . .

"Q. Did she tell you Arthur and Mildred did other things around there for her? A. She said Arthur took care of the wood and cleaned up the yard for her, said they would have to come up every two weeks and go down town with her to pay her bills up."

When Arthur Grobbe was on the witness stand his attorney asked if he had an opinion as to the fair and reasonable amount that was expended by himself and wife for groceries and clothing for Mrs. Grobbe; also what, in his opinion, was the fair and reasonable value of the services of himself and wife to Mrs. Grobbe from September 1, 1941, to the time of her death. The trial court sustained objections to these questions. At the hearing of the motion for a new trial Arthur Grobbe's affidavit was offered, in which he stated that the reasonable amount spent for groceries and clothing was $15 per month and that the fair and reasonable value of the services rendered by himself and wife from September 1, 1941, to the time of her death was $150 per month.

In this court the appellants, Arthur and Mildred Grobbe, present as the questions of law to be determined:

"1. Whether or not claimants' evidence was sufficient to permit them to recover upon an express contract, agreement or mutual understanding.

"2. Whether or not the claimants are entitled to recover on an implied contract if they did not prove sufficiently the express contract.

"3. Whether or not the Trial Court should have excluded evidence of the claimants as to the value they placed upon their services."

Upon the first point the journal entry shows the court found "from the evidence that no contract existed or was ever entered into between appellants, Arthur Grobbe and Mildred Grobbe, and Louise Grobbe, deceased, as alleged in appellants' petition." In their brief appellants pray:

"The evidence in this case clearly discloses that there was a contract, a promise and an understanding that the services which Mildred and Arthur Grobbe rendered were to be paid for by the decedent at the rate of $150 per month, . . . The transcript contains evidence of eight witnesses who testified as to this agreement."

We have set out the testimony of these witnesses. There was no witness to the making of the contract. It is true that the testimony of some of the witnesses, standing alone, tends to support the view that Mrs. Grobbe understood such a contract had been made. The testimony of the others tends to disprove it. It contained such expressions as: That was what she wanted to do; or what she thought would be about right; or that she wanted them to receive

their share of the estate; or simply that she had paid them some and that she wanted to pay them more, without stating any amount. The fact that on December 27, 1941, Arthur accepted a check for $80 for "one month's salary" tends to disprove any contract for $150 per month. It was the function of the trial court to weigh the testimony here referred to and all other evidence shown by the record that had any bearing upon the question; to pass upon the credibility of witnesses and to weigh their testimony. We cannot say the court erred in its conclusions upon those questions. In their reply brief appellants rely heavily upon the case of *In re Estate of Wert*, 165 Kan. 49, 193 P. 2d 253, 166 Kan. 159, 199 P. 2d 793, but in that case there were three competent witnesses present at the time the contract was made. Here there were none. We think the case is not helpful to appellants.

Respecting the second question presented for our decision as to whether appellants are entitled to recover on an implied contract if they did not prove sufficiently the express contract, appellants in their brief here argue "that even if the court should find that there was no express contract, promise or understanding between the parties, still the claimants should be allowed to recover the reasonable value of their services on the theory of *quantum meruit*, or an implied contract." Upon this point the court, as shown by its journal entry, found, "that appellants are not entitled to recover upon *quantum meruit* in any amount for services rendered as alleged in their petition."

Appellants concede it is well settled by the authorities that when children live in the home with their parents as a part of the family they cannot recover for their services in the absence of a specific contract providing payment therefor, but contend this situation does not apply when the children are grown, have a home of their own, live away from their parents, but do perform services for them, in which event it is argued there is a presumption to pay for such services, citing 28 R. C. L. 680, 681, and *Templeton v. Biegert*, 79 Kan. 638, 100 Pac. 654, and authorities there cited. It may be said that both rules are predicated upon presumption, that is to say that when one resides in the home of the parents or near relative it is presumed the services to be performed by him are not to be compensated for unless there is a contract to that effect, while if the person performing the services lives away from the one for whom the services are performed there is a presumption to pay for the services performed.

Either presumption may be overcome by proof. We shall not undertake to analyze either of these presumptions further than to say that under all the facts and circumstances shown by the evidence in this case, and the further fact that in their petition the appellants predicated their right to recover upon the oral contract, we think the court did not err in its conclusion upon this point.

Upon the third point, whether the court erred in excluding the evidence of Arthur as to the value he placed upon the services, there is authority to the effect that one suing on *quantum meruit* for services performed ordinarily may be permitted to testify to his view of the value of his services. The case was tried to the court and the court had Arthur's views of that subject in his affidavit upon the motion for a new trial and no doubt gave it such consideration as he thought it was entitled to receive in view of all the facts and circumstances of the case as shown by the evidence. More than that, claimants in their petition predicated their right to recover upon contract. The result is, we find no error in the ruling of the court upon the appeal of Arthur and Mildred Grobbe and its judgment is affirmed.

We turn now to the appeal of Elsie Misamore and John W. Brookens, administrator of the estate, from the judgment of the trial court which allowed the claim of Arthur and Mildred Grobbe for food and clothing furnished Mrs. Grobbe during her lifetime in the sum of $729.92. The appellants contend no substantial, competent evidence justified the court in making that allowance. The point is well taken. Hereinbefore we have abstracted the testimony of the merchants from whom groceries were purchased to the effect that Mrs. Grobbe paid for her groceries. In addition to the evidence previously set out there was introduced the items making up the bank account of Mrs. Grobbe, including her checks and receipted bills. This showed total expenditures for groceries of $663.78, or $10.13 per month, over the term. It is argued by the claimants that this was grossly inadequate for her needs. There is no evidence on that point and we cannot take judicial notice of it. There is testimony of the merchants to the effect that sometimes Mildred bought groceries which were delivered to Mrs. Grobbe's home which were charged to Mildred's account; but as against that there was testimony that in some instances Mrs. Grobbe's check was used by Mildred to pay on her account. All of this would tend to show that Mrs. Grobbe paid for groceries bought for herself. There is the

matter of the canned goods, ten or twelve cases at $3.50 to $4 per case, which Mildred purchased while working for Mr. Stone and could get them at wholesale and which were taken to Mrs. Grobbe's home. There is also evidence, when at Kansas City or Topeka, she bought some clothing for Mrs. Grobbe. There is no evidence that Mrs. Grobbe did not pay Mildred for these. The record shows a check to Mildred on February 23, 1943, of $47.83, another on April 3, 1944, of $15, and another on January 20, 1944, of $42.50. Apparently the judgment of the court was predicated alone upon the allegations of claimants' petition that they had furnished Mrs. Grobbe groceries and clothing to the extent of $15 per month throughout the 65.6 months. This is insufficient.

The result is the judgment for petitioners for food and clothing furnished Mrs. Grobbe is not based upon any substantial competent evidence and should be reversed with directions to render judgment for the administrator and Elsie Misamore.

It is so ordered.